IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| DAVID DWAYNE CASSADY, AKA | : | |
| DANA MARIE CASSADY, | : | |
| | : | |
|    Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 7:18-CV-158 (HL) |
| GREGORY DOZIER, DON BLAKELY, | : | |
| DARREN JACKSON, SHUNDA WOODS, | : | |
| SHARON LEWIS, EDDIE WILLIAMS, and | : | |
| LESLIE PLUGGE, | : | |
| | : | |
|    Defendants. | : | |
| _____ | : | |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff David Dwayne Cassady a/k/a Dana Marie Cassady, a transgender female, filed this action pursuant to 42 U.S.C. § 1983 after she[1] was raped twice by inmates while she was incarcerated at Valdosta State Prison ("VSP"). She alleges Defendants knew she faced a substantial risk of serious harm and failed to protect her in violation of her Eighth Amendment rights. Plaintiff names seven prison officials as Defendants: Gregory Dozier, Commissioner of the Georgia Department of Corrections ("GDC"); Don Blakely, Warden of VSP; Darren Jackson, Deputy Warden of Security at VSP; Shunda Woods, Deputy Warden of Care and Treatment at VSP; and Sharon Lewis, Medical Director for the

---

[1] Plaintiff uses female pronouns, and the Court will do the same.

Physical Health Division of GDC's Medical Operation (collectively, the "GDC Defendants"); and Eddie Williams, Assistant Mental Health Unit Manager at VSP; and Lesley Plugge, Mental Health Unit Manager at VSP, who were both employed by MHM Correctional Services, Inc., a private company that contracted with the GDC for inmate services (collectively, the "MHM Defendants"). Defendants have filed Motions for Summary Judgment. After fully considering the record, the parties' arguments, and the relevant law, the Court finds the GDC Defendants are shielded from liability by qualified immunity, and no genuine issue of material fact exists that the  MHM Defendants were deliberately indifferent to Plaintiff's Eighth Amendment rights. Thus, all Defendants are entitled to judgment as a matter of law, and the Court **GRANTS** their Motions for Summary Judgment [Docs. 54 and 55].

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of

---

[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

material fact" and that entitles it to a judgment as a matter of law.[3] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[4]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[5] "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[6] In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[7] A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[8] "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[9]

---

[3] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[4] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

[5] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[7] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380) (2007)).

[8] *Id.* (internal quotation marks omitted).

[9] *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

## BACKGROUND

Plaintiff is transgender. She was born biologically male, but she identifies with the female gender. Plaintiff has been incarcerated in male prisons with the Georgia Department of Corrections since 1992, after being convicted of kidnapping, aggravated sodomy, and impersonating an officer. Plaintiff is effeminate, receives hormone treatments, and exhibits "secondary sex characteristics"[10] including full breasts and a feminine shape.[11] Before arriving at VSP, Plaintiff had been the victim of two sexual assaults, one by a correctional officer and one by another inmate, neither of which occurred at VSP.[12]

On March 29, 2018, Plaintiff was transferred from Baldwin State Prison, a medium security prison, to VSP, a close security prison.[13] Plaintiff did not want to be housed at VSP because of its violent reputation and because she felt, as a medium security inmate, she did not belong in a close security facility.

Upon arrival at VSP, Plaintiff met with a mental health counselor and was classified as a high functioning, Mental Health Level III ("MH III") transgender inmate,

---

[10] Plaintiff characterizes her breasts and feminine shape as "secondary sex characteristics" throughout the record.

[11] *See, e.g.,* Letter to Warden Blakely [Doc. 54-5, p. 27]; Pl. Depo. p. 95. [Doc. 54-3].

[12] Pl. Depo. dated March 4, 2020, p. 93 [Doc. 55-12].

[13] Close security prisons in the GDC are the highest security prisons. On its website, the GDC states that "offenders classified as close security typically fall in one or more categories: escape risk, assault history, deemed dangerous, or have detainers for other serious crimes. A detainer is a request from other law enforcement agencies to hold an offender for pending charges." http://www.dcor.state.ga.us/AboutGDC/FactSheets/close-security-facilities. (last visited March 27, 2022).

with a primary diagnosis of Gender Disphoria.[14] She received information about reporting sexual assaults and harassment, and watched a Prison Rape Elimination Act ("PREA") video about how to report sexual assaults and harassment. Plaintiff was PREA classified as both victim and predator based on her criminal history.[15]

Because of her MH III classification, Plaintiff was eligible for housing in one of two mental health supported living units available at VSP—Dorm H-1 or Dorm G-2.[16] Dorm H-1 housed lower functioning MH III inmates and contained the Acute Care Unit ("ACU") which housed inmates experiencing mental health emergencies.[17] Dorm H-1 also contained mental health lockdown segregation cells for inmates that requested and were granted protective custody.[18] Dorm G-2 housed higher functioning MH III inmates.

Defendant Lesley Plugge, Director of the Mental Health Unit, was responsible for placement recommendations for MH III inmates after consideration of their mental health level, their level of functioning, and the available housing options at the facility.[19] Based on Plainitff's PREA classification as both victim and predator (which made her

---

[14] Plugge Decl., ¶ 8 [Doc. 55-4].

[15] Plugge Decl. ¶17 [Doc. 55-4].

[16] *Id.* at. ¶¶ 7, 8.

[17] *Id.* at ¶ 7.

[18] *Id.* This also comports with Plaintiff's understanding of Dorm H-1. According to Plaintiff, dorm H-1 is divided into two separate areas: the "lower range" of "caged in" ACU cells that held suicide-watch inmates restricted to his or her cell and the "upstairs room" which housed "lower functioning inmates, or inmates who had been … vulnerable to sexual assault" and were not gang related. Pl. Depo. at pp. 104-107.

[19] Plugge Decl. ¶ 6.

ineligible for placement in Dorm H-1 with lower functioning MH III inmates), her high level of mental function, and her transgender status, Plugge placed her in Dorm G-2, the best housing available at VSP.[20]

Dorm G-2 housed other gay, bisexual, transgender, or queer ("GBTQ") inmates. During the time of Plaintiff's incarceration at VSP, there were three other transgender MH III inmates in G-2, and seven other inmates considered to be allies of transgender inmates by virtue of their GBTQ self-identification.[21] Thus, 21% of the inmates in Dorm G-2 self-identified as GBTQ.[22] Defendant Eddie Williams, the Assistant Mental Health Unit Manager at VSP, was also responsible for placement recommendations for mental health inmates.[23] Williams believed that "housing [Plaintiff] on G2 promoted positive mental health and the safety and security for [her] and a supportive community of inmates."[24]

But Plaintiff testified Dorm G-2 also housed gang members and was "volatile."[25] When she arrived in G-2, other inmates warned her it was a "dangerous environment."[26] Plaintiff said that the "majority [of] inmates in G-2 were gang affiliated, people who were always in trouble, fighting, stealing, in some type of disciplinary infractions."[27]

---

[20] *Id.* at. ¶ 17.
[21] Williams Decl. ¶ 8 [Doc. 55-11]; Plugge Decl. ¶ 8 [Doc. 55-4]
[22] *Id.*
[23] Williams Decl. ¶ 6.
[24] *Id.* at ¶ 8.
[25] Pl. Depo. dated March 4, 2020, pp. 107-08.
[26] *Id.* at pp. 80-81.
[27] *Id.* at p. 107.

Inmates tore light fixtures out of the ceiling; it was "like a weapons manufacturing company" where inmates sharpened objects into weapons; staff did not perform inspections or make themselves available for questions; gang members ran an "extortion racket" extorting money from weaker inmates in exchange for protection; and gladiator-style fights occurred between the inmates.[28] Plaintiff testified that she "felt like [her] life [was] in danger" and that she was "going to be subjected to a sexual harassment or assault."[29]

Plaintiff knew several of the inmates in G-2, including Jason Mobuary[30] and another transgender inmate.[31] Plaintiff states that although the prison assigned which room each inmate in G-2 occupied, "nobody was in their right room down there," and the "dominant gang members" ultimately decided which rooms each G-2 lived in.[32] Plaintiff was "relieved" when it was decided that she would share a cell with Mobuary because he was protective of her.[33] Mobuary would escort Plaintiff to "chow," escort her to "pill call," and stand out on the rail and watch to ensure her safety in the shower.[34]

---

[28] *Id.* at pp. 82-83.
[29] *Id.* at. 82-83.
[30] Jason is identified as Jason "Mulberry" in Plaintiff deposition, but his declaration clarifies that his name is Jason "Mobuary." Mobuary Decl. [Doc. 55-8].
[31] Pl. Depo. dated March 4, 2020, p. 73.
[32] *Id.* at 76-77.
[33] *Id.* at. p. 76, 77, 81.
[34] *Id.* at p. 83.

Plaintiff "hardly ever" went and watched television because it was controlled by dominant gang members.[35]

Within a week, Plaintiff began to suffer sexual harassment from other inmates saying such things as "you're going to be my bitch,"[36] and "when are you going to let me have sex with you?"[37] When Plaintiff went to medical, no prison official would be in the waiting room, and it "would be slap full inmates who would . . . sit there and masturbate on [her]."[38] Plaintiff's roommate, Morbuary, stated that after Plaintiff arrived in G-2, "time after time . . . [Morbuary] had to intervene to stop gang members and others from pushing up on her."[39] Nothing in the record indicates any Defendant overheard any comments made to Plaintiff or witnessed any such conduct.

On April 5, 2018, Plaintiff allegedly wrote a letter to Defendant Don Blakely, the Warden of VSP, expressing her fear of sexual assault while being housed in G-2 and requesting to be moved and transferred. Warden Blakely was responsible for the overall operation of the prison.[40] Plaintiff wrote:

Dear Wardon Don Blakely:
I'm writing to you with concerns regarding my personal safety with being housed in in G-2. I am a 49 year old transgender woman who has significantly noticeable secondary sex characteristics including full breasts and a feminine shape. I am a victim of repeated sexual assaults at the hands of both inmates and officers.

---

[35] *Id.* at p. 83.
[36] *Id.* at. p. 84.
[37] *Id.* at pp. 90-91.
[38] *Id.* at p. 91.
[39] Decl. Jason Morbuary, Pl. Depo. dated Sept. 9, 2020, Ex. 6 [Doc. 55-8, p. 19].
[40] Blakely Decl. ¶ 4 [Doc. 54-6].

My situation under the PREA policies dictate that I must be housed in a PREA safe dorm. G-2 is not a PREA safe dorm. Upon my arrival at Valdosta, I was told by Lieutenant McDougle I would be housed in a PREA safe dorm. The type of inmates housed in G-2 are gang members who have a history of violence i.e. fighting, stabbing, and raping other weaker inmates. I'm asking to be moved to a PREA safe dorm.

Warden Blakely, you received my institutional records detailing my history of being sexually assaulted, gender dysphoria (transgender) diagnosis, history of hormone therapy, past attempts at self-harm and repeated requests for ongoing care. I'm facing a substantial risk of being sexually assaulted due to my transgender status.

I'm concerned I will become sexually assaulted by these gang members or even physically beaten or threatened with a weapon into having sex. I'm already being sexually harassed daily and threatened about conforming to their demands in becoming their sex slave. I'm afraid and tired of living under this kind of torture.

Please move me to a PREA safe dorm so I can do my time without fear of being sexually assaulted again. I am a medium security inmate sent here to Valdosta State Prison (according to SCRIBE) on a warden to warden transfer without a disciplinary report and a neutral status. Valdosta is a closed security facility housing the most violent inmates in the prison system. I should not be here. There is no justified reason for why I was sent here. Please have me transferred to a medium security facility.[41]

VSP was advised in a federal PREA audit not to designate any dorm as "PREA safe," and neither G-2 nor H-1 had that designation.[42]

A few days later Plaintiff allegedly spoke with the Warden who acknowledged that he had received her letter but did not "do dorm assignments" and told Plaintiff "to get with [her] counselor on that."[43] Blakely denies receiving any letter or having any conversation with Plaintiff. Regardless, Blakely states that he "deferred to the

---

[41] April 5, 2018 letter to Warden Blakely, Ex. 1 to Pl. Depo. dated August 26, 2020 [Doc. 54-5, pp. 27-28].
[42] Plugge Decl. ¶ 16 [Doc. 55-4].
[43] Pl. Depo. dated March 4, 2020, p. 97.

counselors and mental health professionals to guide any decisions regarding the housing assignments for [mental health] inmates."[44]

On April 12, 2018, Plaintiff allegedly wrote "basically the same letter [she] wrote to [Warden] Blakely" to Defendant Shunda Woods, the Deputy Warden of Care and Treatment at VSP.[45] Defendant Woods was responsible for the care and treatment received by all inmates at VSP.[46] In the letter, Plaintiff informed Ms. Woods that she had written to Warden Blakely; G-2 was not a PREA safe dorm; gangs ran "rampant within th[e] dorm assaulting inmates with weapons"; she was scared for her life; she'd been "threatened and told [she would] be [inmates'] sex slave or get the f__k beat out of [her]"; inmates would not leave her alone; and she faced "substantial risk of being sexually assaulted due to [her] transgender status and the dorm [she was] housed in."[47] Plaintiff asked Ms. Woods to intervene, move her to a PREA safe dorm, and consider transferring her back to a medium security prison.[48] Plaintiff received no response, and when she allegedly spoke with Ms. Woods a few days later in the hallway in the education building, Ms. Woods acknowledged receipt of the letter and told Plaintiff "if you would stop taking the hormones and act like the man that you know you are, you wouldn't have these problem[s]. I'm not moving you."[49]

---

[44] Blakely Decl. ¶ 16.
[45] Pl. Depo. dated March 4, 2020, pp. 97-98.
[46] Woods Decl. ¶ 4 [Doc. 54-9].
[47] April 12, 2018 Letter to Shunda Woods, Pl. Depo. dated Aug. 26, 2018, Ex. 2 [Doc. 54-5, pp. 29-30].
[48] *Id.*
[49] Pl. Depo. dated March 4, 2020, pp. 99-100.

Ms. Woods denies receiving any letter or any communication from Plaintiff that she was being harassed or felt unsafe.[50] Woods also states that "GDC's mental health personnel determined Inmate Cassady's housing assignment, and [she] deferred to those experts' judgment."[51]

Plaintiff filed one grievance before the first sexual assault.[52] On April 15, 2018, Plaintiff complained that she had gender dysphoria, no counselor at VSP was qualified to help her, and she wanted a transfer to a prison with a psychologist and counselor to put her on a treatment plan.[53] She did not mention any harassment or fear of sexual assault.

The next day, on April 16, 2018, Plaintiff states she wrote a letter to Defendant Lesley Plugge, the Mental Health Unit Manager at VSP. Ms. Plugge administered the mental health unit and coordinated assessments and counseling in collaboration with a multidisciplinary team of counselors, psychologists, and psychiatrists to every inmate at VSP, including inmates in unit G-2.[54] In her letter, Plaintiff explained she was transgender and had a history of prior sexual assaults; gang members preyed on weaker inmates in G-2; she faced "substantial risk" of being sexually assaulted because of her transgender status; despite her letters to Blakely and Woods, no action had been taken;

---

[50] Woods Decl. ¶¶ 11, 14 [Doc. 54-9].
[51] *Id.* at ¶ 21.
[52] Pl. Decl. attached to May 1, 2018 letter to Judge Altman [Doc. 55-8, ¶ 10, p. 43]; April 15, 2018 Grievance [Doc. 55-7, p. 2-3].
[53] *Id.*
[54] Plugge Decl. ¶ 4.

she remained "housed in G-2 with perpetrators who continue[d] to sexually harass and coerce [her] with threats into having sex"; and she pleaded with Plugge to transfer her to a medium security prison and move her to a PREA safe dorm at VSP.[55]

Plugge denies receiving any such letter. Plugge states that she was on vacation in the Dominican Republic from April 15 to April 21, 2018, and attached a copy of her stamped passport showing she was, in fact, in the Dominican Republic on those dates.[56]

On April 17, 2018, Plaintiff allegedly wrote a letter to Defendant Darren Jackson, Deputy Warden of Security at VSP. Defendant Jackson was responsible for the overall security operation of the prison.[57] In her letter, Plaintiff stated that she was a transgender woman with secondary sex characteristics and a prior victim of sexual assault; she was assigned to G-2 which was "overrun with gang members who [were] recking [sic] havoc on the weaker inmates"; she did not feel safe and feared "being forced into having sex"; she was being "harassed on a daily basis by inmates demanding sex"; and she needed to be moved to a PREA safe dorm.[58] Plaintiff states when she saw Mr. Jackson on the sidewalk, he acknowledged receipt of the letter and told Plaintiff she needed to talk to Ms. Plugge, the Mental Health Unit Manager.[59]

---

[55] April 16, 2018 Letter to Lesley Plugge, Pl. Depo. dated Sept. 9, 2020, Ex. 3 [Doc. 55-8, pp. 11-12].
[56] Plugge Decl. ¶ 12; Copy of passport [Doc. 55-9].
[57] Jackson Decl. ¶ 4 [Doc. 54-7].
[58] April 17 Letter to Darren Jackson, Pl. Depo. dated Aug. 26, 2018, Ex. 4 [Doc. 54-5, pp. 31-32].
[59] Pl. Depo. dated March 4, 2020, p. 113.

Jackson denies Plaintiff ever informed him she was being sexually harassed.[60] He also states that "[s]ince [Plaintiff] was a mental health inmate, [he] was not involved in her housing assignments. The mental health professionals made those decisions."[61]

On April 19, 2020, Plaintiff states she met with Defendants Plugge and Williams, the manager and assistant manager of Mental Health Unit at VSP.[62] Plaintiff testified that she told them she was being harassed and feared becoming a victim of sexual assault.[63] She asked to be moved to a PREA safe dorm. Plaintiff testified that both Williams and Plugge seemed concerned and told Plaintiff no beds were available in H-1.[64] Williams suggested that Plaintiff "find a friend and stick close to him,"[65] and Plugge told her "she would look into having [Plaintiff] transferred and getting moved."[66] Plugge denies this meeting took place, as she was on vacation in the Dominican Republic from April 15 to Arpil 21, 2018,[67] and Williams also denies this meeting took place.[68]

The next morning, on April 20, 2018, Plaintiff alleges she was raped in her cell. After Plaintiff's cellmate, Morbuary, left their cell, a gang member entered, locked the

---

[60] Jackson Decl. ¶ 19.
[61] *Id.* at ¶ 17.
[62] Pl. Depo. dated Sept. 9, 2020, p. 71 [Doc. 54-5].
[63] *Id.* at p. 72.
[64] *Id.* at p. 83.
[65] *Id.* at p. 72 [Doc. 54-5].
[66] *Id.* at p. 83.
[67] Plugge Decl. ¶ 12.
[68] Williams Decl. ¶ 9.

door, and began raping Plaintiff at knifepoint.[69] When Morbuary came back to their cell, he "witnessed a gang member, Ladamien Baldwin (nicknamed "Wacko") holding a shank (a homemade knife) to [Plaintiff's] throat, in between the locker boxes. [Plaintiff] was pushed against the wall, crying and shaking. . . . The gang member [was raping Plaintiff]."[70] Mobuary punched Baldwin, and Baldwin left the cell.[71]

Plaintiff did not immediately report the rape or go to medical. Baldwin was a "known blood gang member," and she was "scared to death . . . [of] what would happen to [her] if [she] reported it" because those "gangs control[led] things that were going on."[72] Plaintiff states she reported the rape the next morning to Lieutenant Mills and requested protective custody.[73] Plaintiff told Lieutenant Mills that she only knew her assailant's nickname, not his real name, and he responded "yeah, you probably owe him money. Get your ass back to the dorm."[74] Lieutenant Mills is not a defendant in this case.

Ten days after she was raped, on May 1, 2018, Plaintiff met with her mental health counselor, Ms. Cripps. Plaintiff testified that she reported the rape to Ms. Cripps.[75] Ms. Cripps's mental health progress notes state that Plaintiff "has been sexually assaulted

---

[69] Pl. Depo. dated March 4, 2020, p. 116.
[70] Decl. Jason Morbuary, Pl. Depo. dated Sept. 9, 2020, Ex. 6 [Doc. 55-8, p. 19]
[71] *Id.*
[72] Pl. Depo. dated March 4, 2020, pp. 117, 137.
[73] *Id.* at pp. 144, 157
[74] *Id.* at pp. 144, 156-57.
[75] *Id.* at pp. 168-170.

twice, and there are [ ] people who keep propositioning h[er] because [s]he is transgender. . . . Feels that there is no point in filing a grievance because it is ignored. H[er] roommate has kept h[er] from being assaulted. Plus [s]he feels that the person will find out and retaliate."[76]

Also on May 1, 2018, Plaintiff wrote a letter reporting the rape to Defendants Blakely, Jackson, Woods, and Plugge.[77] Plaintiff rebuked them for failing to help her, asked for protection, and informed them she would be seeking legal representation.[78]

On May 6, 2018, she wrote a letter to Defendant Gregory Dozier, Commissioner of the GDC. Plaintiff reported the rape, described her fears and circumstances, and requested he transfer her to a medium security prison.[79] After Defendant Dozier received the letter, a PREA investigation began.[80]

On May 7, 2018, Plaintiff wrote Defendant Williams a letter stating that she "remain[ed] housed with the perpetrators who continue to sexually harass and coerce with weapons to include threats of violence" and detailed the April 20 rape.[81]

A PREA coordinator was notified of Plaintiff's rape allegations on May 17, 2018.[82] Ms. Plugge then triggered the mental health component of the PREA and assigned

---

[76] Cripps Mental Health Progress Notes dated May 1, 2018 [Doc. 55-5, p. 10].
[77] May 1, 2018 Letter, Pl. Depo. dated Aug. 26, 2020, Ex. 5 [Doc. 55-8, pp. 15-17].
[78] *Id.*
[79] May 6, 2018 Letter to Commissioner Dozier, Pl. Depo. dated Sept. 9, 2020, Ex. 7 [Doc. 54-5 p. 36].
[80] Plugge Decl. ¶ 14.
[81] May 7, 2018 Letter to Williams [Doc. 55-8, p. 26].
[82] PREA incident report [Doc. 55-5, pp. 13-14].

Plaintiff's mental health assessment to Defendant Williams.[83] On May 18, 2018, Mr. Williams interviewed Plaintiff and assessed her for trauma.[84] Williams testified that "it appeared to [him] that [Plaintiff] was manipulating the process but out of an abundance of caution [Williams] recommended a follow-up and further evaluation with [Plaintiff's] assigned mental health counselor and her psychologist."[85] On May 20, 2018, Plaintiff filed an official grievance for the April 20 rape.[86]

The Sexual Assault Response Team ("SART") was notified to investigate Plaintiff's allegations on May 21, 2018.[87] On May 23, 2018, the SART investigation found that Plaintiff's allegations of April 20, 2018, were unfounded because "[i]nmate Baldwin was housed in H1 dorm on ACU/SP2 status on 4/20/2018. Inmate Cassady state[d] [s]he had informed several staff members concerning h[er] safety in G2. Staff deny Inmate Cassady['s] allegation. [S]he spoke to Dr. Harrison on 5/2/2018 at h[er] request. [Dr. Harrison] told inmate to report any harassment to the PREA hot line or staff but [s]he never told him [s]he was raped on 4/20/2018."[88]

On June 19, 2018, Defendant Plugge made a transfer request for Plaintiff. Plugge stated that she routinely recommended the transfer of medium security MH III inmates out of VSP. Plugge's transfer recommendation, however, was denied because no

---

[83] Plugge Decl. ¶ 14.
[84] Williams Decl. ¶ 12.
[85] Williams Decl. ¶12.
[86] May 20, 2018 Grievance [Doc. 55-8, pp. 35-36]
[87] PREA incident report [Doc. 55-5, pp. 13-14].
[88] *Id*.

housing was available at any other GDC facility.[89] Plugge left VSP on August 2, 2018, to take another position.[90]

Sometime before August 2018, Plaintiff moved into a different cell with inmate Steven Murray, with whom she began an intimate relationship.[91] Several days before Plaintiff's second rape on August 7, 2018, Plaintiff's first rapist, Baldwin, was let "out of the hole" and put back in dorm G-2 with Plaintiff.[92] Plaintiff states that Baldwin tried to assault her with a knife for "telling on him."[93] Murray stepped in to protect Plaintiff, was stabbed 12 times, and had to be taken to hospital.[94] With her cellmate in the hospital, Plaintiff slept alone in their cell.[95]

On August 7, 2018, Plaintiff fell asleep with the door unlocked.[96] Around 11:00 p.m., Plaintiff was raped again at knifepoint.[97] Her assailant attacked her while she was sleeping and put a towel over her head.[98] Thus, she did not see her attacker, and he disguised the tone of his voice, so she did not recognize it.[99] Plaintiff states she filed a

---

[89] Plugge Decl. ¶19.

[90] *Id.* at ¶18.

[91] Pl. Depo. dated Sept. 9, 2020, p. 37 [Doc. 54-5]; *see also* Mental Health Progress Notes dated June 25, 2018 (Plaintiff "[g]ot a new roommate who has been very supportive and won't let anyone hurt her." [Doc. 55-5, p. 30].

[92] *Id.* at p. 34.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at p. 34.

[97] *Id.* at pp. 34-35.

[98] *Id.* at p. 36.

[99] *Id.*

17

grievance with her counselor the next day,[100] but she never filed a formal grievance, and no reference of the August 7 rape is reflected in her prison record.[101]

Plugge declared that "between March 29, 2018 to August 3, 2019, it was [her] professional judgment that [Plaintiff] was in the safest housing available for her at VSP."[102]

Plaintiff contends Defendants failed to protect her in violation of the Eighth Amendment. All Defendants have moved for summary judgment.

## DISCUSSION

Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."[103]  The Eighth Amendment, in turn, prohibits the infliction of cruel and unusual punishment.[104] "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."[105] A plaintiff may bring a § 1983 claim against a governmental entity or person in his individual or official capacity.[106]

---

[100] *Id.* at p. 47.
[101] Plugge Decl. ¶18.
[102] Plugge Decl. ¶ 19 [Doc. 55-4].
[103] 42 U.S.C. § 1983.
[104] U.S. Const. Amend. VIII.
[105] *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).
[106] *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."[107] Although "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," not every instance of inmate-on-inmate violence "translates into constitutional liability for prison officials responsible for the victim's safety."[108] It is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment."[109] To support an Eighth Amendment claim premised on a failure to protect or prevent harm, "a plaintiff must show that: (1) a substantial risk of serious harm existed; (2) the defendants were deliberately indifferent to that risk; and (3) there was a causal connection between the defendants' conduct and the Eighth Amendment violation."[110]

The law is settled that both objective and subjective elements are necessary components to establish an Eighth Amendment violation.[111] With respect to the objective elements of a deliberate indifference claim, an inmate must first show that "an objectively substantial risk of serious harm" existed.[112] "Second, once it is established

---

[107] *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994).

[108] *Farmer*, 511 U.S. at 833-34.

[109] *Id.* at 828.

[110] *Gaffney v. Warden, Taylor Corr. Inst.*, 2022 WL 18381 at *2 (11th Cir. 2022) (citing *Bowen v. Warden*, 826 F.3d 1312, 1320 (11th Cir. 2016)).

[111] *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).

[112] *Marsh v. Butler Cnty, Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (citation omitted).

that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner."[113] As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."[114]

A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately" and on the basis of what that person knew at the time of the incident.[115] Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference."[116] "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983."[117] Thus, a prison official may avoid Eighth Amendment liability for failure to protect an inmate in any one of three ways: (1) by demonstrating that the official was not aware "of the underlying facts indicating a sufficiently substantial danger" and was

---

[113] *Id.* at 1029.
[114] *Farmer*, 511 U.S. at 837-38.
[115] *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).
[116] *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks and citation omitted).
[117] *Id.*

"therefore unaware of a danger"; (2) by admitting awareness of "the underlying facts" of a substantial danger but "believe[ing] (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) by showing that the official "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted."[118]

Plaintiffs may advance an Eighth Amendment claim for failure to protect an inmate under two different theories. "Under the first theory—the particularized risk claim—[the plaintiff] may show that [she] was the target of a specific threat or danger, and that the employees subjectively were aware of the individualized danger, yet they failed to act to alleviate that risk. Alternatively, on the second theory—the dangerous conditions claim—[the plaintiff] may demonstrate that the prison conditions [she] was subjected to were so dangerous that they resulted in cruel and unusual punishment."[119]

## I. GDC DEFENDANTS

### A. Eleventh Amendment Bars any Official Capacity Claim against GDC Defendants

The Eleventh Amendment bars any claim for monetary damages Plaintiff may be asserting against the GDC Defendants in their official capacities. The GDC is an agency of the State of Georgia, and the GDC Defendants are employees of the GDC. Official capacity lawsuits are "in all respects other than name, … treated as a suit against

---

[118] *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844) (internal quotation marks omitted).

[119] *Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016).

the entity."[120] "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity,"[121] or Congress has abrogated the state's immunity.[122] Neither has happened in this case, and thus any claim for money damages Plaintiff asserts against the GDC Defendants in their official capacities are barred by the Eleventh Amendment.

**B. Qualified Immunity Protects the GDC Defendants from Liability on Plaintiff's Individual Capacity Claims**

Qualified immunity protects governmental defendants performing discretionary functions from suit in their individual capacities "unless, at the time of the incident, the 'preexisting law dictates, that is, truly compel[s]' the conclusions for all reasonable, similarly situated public officials" that the defendants' actions violated the plaintiff's federal rights.[123] There is no dispute here that all Defendants were performing discretionary duties. Thus, Plaintiff must show (1) that the prison officials violated a constitutional right and (2) that the right was clearly established at the time of the alleged violations.[124] For a right to be clearly established, the plaintiff may either identify

---

[120] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[121] *See Pennhurst State School & Hospital v. Halderman*, 464 U.S. 89, 100 (1984).

[122] *See Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996)

[123] *Marsh*, 268 F.3d at 1030-31 (quoting *Lassitr v. Alabama A&M Univ.*, 28 F.3d 1146, 1151 (11th Cir. 1994) (*en banc*)) (alteration adopted).

[124] *Marbury*, 936 F.3d at 1232.

precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional.[125]

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."[126] The Court of Appeals for the Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."[127] "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."[128]

Though the Court may begin the qualified immunity analysis with either the constitutional question or the question of whether the violation was clearly established, the Supreme Court has admonished courts to "think hard, and then think again" before addressing the merits of the constitutional claim."[129] Because the alleged constitutional violations here did not violate clearly established law, the GDC Defendants are shielded by qualified immunity and entitled to summary judgment.

1.  Defendant Lewis

---

[125] *Corbitt v. Vickers*, 929 F.3d 1304, 1311-12 (11th Cir. 2019); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[126] *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted).
[127] *Gaines v. Wardynski*, 871 F.3d 1203. 1210 (11th Cir. 2017).
[128] *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).
[129] *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 n. 7 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

Plaintiff attempts to bring a supervisory claim against Defendant Sharon Lewis in her position as Medical Director for the Physical Health Division of GDC. But "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."[130] "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."[131] The necessary causal connection can be established either (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [s]he failed to do so," (2) "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights," or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."[132]

Lewis was in charge of physical healthcare at GDC. Nothing in the record shows that Lewis directly participated in the alleged unconstitutional conduct or that her actions are causally linked to the alleged unconstitutional conduct. Plaintiff did not

---

[130] *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)) (internal quotation marks onmitted).

[131] *Id.* at 1047-48 (citation omitted).

[132] *Id.* at 1048 (citation omitted).

communicate with Lewis, by letter or otherwise; Lewis had no role in Plaintiff's mental healthcare or housing assignment while at VSP; and nothing in the record shows Lewis had any affiliation or supervisory responsibility over anyone involved in Plaintiff's claims.   Thus, Plaintiff cannot maintain a claim against Lewis, and she is entitled summary judgment.

2.  <u>Defendant Gregory Dozier</u>

No clearly established law shows that Commissioner Dozier would have been subjectively aware of a particularized risk of harm to Plaintiff before her April 20th assault.[133] Plaintiff contends Commissioner Dozier was subjectively aware of a substantial risk of harm because he knew (1) Plaintiff was a transgender inmate with secondary female sex characteristics in a close security prison; (2) she had a history of prior litigation in which he was a defendant; and (3)  she was a prior victim of sexual assaults.   But such knowledge is insufficient under prior precedent to establish Commissioner Dozier would have known Plaintiff was at a particularized, substantial risk of sexual assault, as opposed to a mere possibility of general risk.

It is undisputed Commissioner Dozier had no firsthand knowledge Plaintiff had received any threats or felt in danger before the April 20th assault. Plaintiff's first direct communication with Commissioner Dozier was when she reported the rape in her letter

---

[133] Commissioner Dozier retired in June 2018, and therefore cannot be held liable for any constitutional violation arising out of Plaintiff's August 7, 2018 assault.

to him dated May 6th, seventeen days after the rape occurred. Plaintiff has provided no precedent, and the Court could not on its own find any, that establishes Commissioner Dozier would have subjectively known Plaintiff was at a substantial risk of assault in Dorm G-2 on April 20th because she was transgender and a prior victim of sexual assault at other institutions during her more than 20 years of incarceration in the GDC. And Plaintiff's prior litigation with Commissioner Dozier involved her attempt to obtain sexual reassignment surgery while in the prison system, not as a victim of any assault. The Eleventh Circuit has made clear that general awareness of possible violence is insufficient to establish liability.[134]

Plaintiff's reliance on *Farmer v. Brennan*[135] is inapposite. Although *Farmer* involved two transgender inmates with feminine characteristics who brought failure to protect claims after suffering sexual assault, the similarity ends there. The inmates in *Farmer* had been placed in segregation for safety concerns and then transferred to a more dangerous prison and housed in general population where one was later beaten and raped in her cell. The plaintiffs had alleged that the prison had a history of sexual assaults and violence, and the Supreme Court remanded the case so the plaintiffs could complete discovery.

---

[134] *Carter v. Galloway*, 352 F.3d at 1350.
[135] 511 U.S. 825 (1994).

Plaintiff argues *Farmer* put Defendants on notice that Plaintiff, as a transgender inmate, required heightened protection. But Plaintiff received heightened protection. When Plaintiff arrived at VSP, the Mental Health Unit classified her as a high functioning, MH III inmate. She was not assigned to VSP's general population. Instead, she was assigned to Dorm G-2 with other MH III inmates, 21% of whom self-identified as GBTQ. Defendants Williams and Plugge were responsible for placement recommendations for mental health inmates, and they both recommended housing Plaintiff in Dorm G-2 because it "promoted positive mental health," was best for her "safety and security," provided "a supportive community of inmates,"[136] and "was [ ] the safest housing available for her at VSP."[137] *Farmer* cannot serve as clearly established law that Commissioner Dozier actually would have known Plaintiff was at a particularized risk of substantial harm while housed in Dorm G-2 at VSP.

Neither is there clearly established law showing that the prison conditions in G-2 were so unsafe that any reasonable official in Commissioner Dozier's shoes would have known of a substantial risk of harm to Plaintiff. "[I]n order to succeed on a 'prison conditions' theory, a plaintiff . . . must prove 'confinement in a prison where violence and terror reign."[138] It is true that "[a] prisoner has a right, secured by the [E]ighth [A]mendment to be reasonably protected from a constant threat of violence . . . by his

---

[136] Williams Decl. ¶ 8 [Doc. 55-11].
[137] Plugge Decl. ¶19 [Doc. 55-4].
[138] *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th cir. 2014 (quoting *Purcell*, 400 F.3d at 1320).

fellow inmates."[139] But this is a high threshold which requires that a plaintiff demonstrate conditions that "shock the conscience" to survive summary judgment.[140] Plaintiff's testimony that G-2 housed gang members, was a "dangerous environment" involving inmates making weapons and fighting with each other, and that she was "being sexually harassed daily and threatened"[141] and "harassed on a daily basis by inmates demanding sex,"[142] is insufficient to demonstrate that G-2 was a place "where violence and terror reign."[143] No evidence suggests sexual assaults were common at VSP or that Plaintiff was exposed to "constant and unreasonable" violence.[144]

Finally, no clearly established law shows Commissioner Dozier could be liable on Plaintiff's supervisory liability claim. The record contains no evidence of widespread abuse that put Commissioner Dozier on notice of any need to correct the alleged constitutional deprivation. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."[145]   The record contains no

---

[139] *Purcell*, 400 F.3d at 1320 (quotation and alterations omitted).

[140] *Id.* at 1323.

[141] April 5, 2018 letter to Warden Blakely [Doc. 54-5, p. 27].

[142] April 17, 2018 letter to Darren Jackson [Doc. 54-5, p. 32].

[143] *Harrison v. Culliver*, 746 F.3d 1288, 1299-1300 (11th Cir. 2014) (holding that the prison warden could not be held liable despite evidence of four assaults in a specific location over three years because such evidence was "hardly sufficient" to demonstrate that the prison was one "where violence and terror reign.").

[144] *Keith*, 749 F.3d at 1048; *see also Harrison*, 746 F.3d 1288 (five stabbings in the unguarded hallway was insufficient to show a setting where "violence and terror" reigned); *Marbury*, 936 F.3d at 1234 (fifteen gang-related stabbings insufficient to show "an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm.").

[145] *Keith*, 749 F.3d at 1048 (quoting *Hartley*, 193 F.3d at 1269).

evidence of widespread sexual assaults at VSP. Plaintiff had no prior history of being sexually assaulted when she was previously held at VSP. And no evidence shows any other inmate being sexually assaulted at VSP. Thus, Plaintiff fails to show Commissioner Dozier's alleged constitutional violations violated clearly established law, and he is entitled to qualified immunity.

   3.   Defendants Don Blakely, Darren Jackson, and Shunda Woods

No clearly established law shows Defendants Blakely, Jackson, and Woods would have actually known that Plaintiff was at a substantial risk of sexual assault as opposed to a mere possibility of assault before April 20th. Viewed in the light most favorable to Plaintiff, the record shows that she wrote letters and complained directly to Defendants Blakely, Jackson, and Woods prior to her April 20th assault. She expressed fear she would be sexually assaulted by unidentified "gang members" because she was a transgender woman with full breasts and a feminine shape and that she was being sexually harassed daily and threatened by unidentified inmates into being their "sex slave." She requested to be moved to a "PREA safe dorm" and sought a transfer to a medium security prison because she did not feel she belonged in VSP.

The record does not show Blakely, Jackson, or Woods has a belief, suspicion, or knowledge Plaintiff was subjected to a particularized risk of serious harm.[146] Although Plaintiff is not required to identify a specific inmate, she must identify a particularized

---

[146] *See Estate of Owens*, 660 F. App'x at 770.

risk. Plaintiff testified that the majority of inmates in G-2 were gang-affiliated. In her complaints to Defendants, she did not identify a specific gang that threatened her; she was not a member of any rival gang; and nothing in the record indicates Plaintiff had a known debt or romantic relationship with any gang members that may have put her at a higher risk for assault.[147] Even if Defendants knew of an objective risk of harm because Plaintiff was transgender and reported sexual harassment and threats, nothing in the record shows Defendants drew, or even could have drawn, any inference of a particularized risk of harm.[148]

Plaintiff relies on *Rodriguez v. Sec'y for Dept. of Corrs,*[149] but *Rodriguez* is distinguishable. There, Rodriguez had informed prison staff that members of his former gang had threatened to kill him upon his release into the prison's general population. Thus, Rodriguez had alleged "a specific threat to his life by fellow inmates he knew personally,"[150] and the Eleventh Circuit held that a genuine issue of material fact existed about whether the risk of harm was substantial.[151] Here, Plaintiff was not a member of a rival gang and her expressed fear of sexual assault from "gang members" is too vague to establish a particularized threat or fear from which Defendants could actually know of a substantial risk of harm and draw on that knowledge to protect her.

---

[147] *Id.* at 771.

[148] *See id.* at 771.

[149] 508 F.3d 611 (11th Cir. 2007).

[150] *Washington v. Warden,* 847 F. App'x 734, 738 (11th Cir. 2021) (discussing *Rodriguez*).

[151] *Rodriguez,* 508 F.3d at 619.

Indeed, *Marbury v. Warden*,[152] and *Carter v. Galloway*,[153] suggest that the risk of harm here was not substantial. In *Marbury*, the plaintiff had alleged that he heard from a friend that an unnamed prisoner intended to hurt him. Even with a specific threat, the Eleventh Circuit held that the threat alone did not establish a substantial risk of harm. The plaintiff needed to provide prison officials with "further information enabling them to conclude that the risk was substantial and not merely possible."[154]

In *Carter*, the Eleventh Circuit affirmed summary judgment for the defendants because they lacked the requisite subjective awareness of the risk posed to the plaintiff. Carter, a medium-security inmate with no history of violence, was housed with a close-security inmate who had a record of violence and was known by officials to have caused many problems during his incarceration.[155] Officials had observed Carter's cell-mate pacing the cell like "a caged animal" as he threatened officials and orderlies.[156] Carter requested reassignment after reporting verbally and in writing that his cell-mate threatened him, was planning to fake a hanging, and was "acting crazy," but officials did nothing. One week later the cell-mate stabbed Carter.[157] The Eleventh Circuit held that although the defendants knew his cell-mate was a "problem inmate" who was "prone to violence," and they had notice from Carter that his cell-mate was "acting

---

[152] 936 F.3d 1227 (11th Cir. 2019).
[153] 352 F.3d 1346 (11th Cir. 2003).
[154] *Marbury*, 936 F.3d at 1236.
[155] *Carter*, 352 at 1348-49.
[156] *Id.* at 1348.
[157] *Id.*

crazy," defendants had only a generalized, objective knowledge of the risk, not a subjective awareness of the risk, because Carter never told defendants he feared his attacker, that he had been "clearly threatened," and never asked to be placed in "protective custody."[158] "Without a case directly on point," and two cases that cut against her, Plaintiff has not shown Defendants Blakely, Jackson, and Woods acted contrary to clearly established law.[159]

Likewise, no clearly established law shows Defendants Blakely, Jackson, and Woods actually knew that Plaintiff was at a substantial risk of sexual assault as opposed to a mere possibility of assault on August 7, 2018. After the PREA investigation, SART found Plaintiff's April 20 rape unfounded. Defendant Woods stated that it was not unusual for an inmate to make an unsubstantiated claim to effectuate a housing assignment they desired. Those claims would be investigated, found unsubstantiated, and the inmate would remain in their assigned dorm.[160] Apart from Plaintiff's own experience on April 20th, the record contains no evidence any other sexual assaults occurred in G-2, that Plaintiff complained of any additional harassment or threats, or that she sought protective custody after the April 20th assault. Because Plaintiff cannot show that Defendants had any additional knowledge that Plaintiff faced a substantial

---

[158] *Id.* at 1349-50.
[159] *Washington*, 847 F. App'x at 738.
[160] Woods Decl. ¶ 29.

risk of serious harm before August 7, 2018, Plaintiff fails to establish they acted contrary to established law.

Finally, Plaintiff fails to provide any precedent supporting her supervisory liability claims against Blakely, Jackson, and Woods or any claim that the prison conditions in G-2 were so unsafe that any reasonable official in their shoes would have known of a substantial risk of harm. The record contains no evidence of widespread abuse that put Defendants Blakely, Jackson, and Woods on notice of any need to correct the alleged constitutional deprivation. The record contains no evidence of widespread sexual assaults at VSP. Plaintiff had no prior history of being sexually assaulted when she was previously held at VSP. And no evidence shows any other inmate being sexually assaulted at VSP. Plaintiff's complaints of sexual harassment and threats do not constitute a "constant threat of violence" in a place where "violence and terror reign." [161]

Thus, Defendants Blakely, Jackson, and Woods are protected from liability by qualified immunity.

## II. MHM Defendants Lesley Plugge and Eddie Williams

---

[161] *Keith*, 749 F.3d at 1048; *see also Harrison*, 746 F.3d 1288 (five stabbings in the unguarded hallway was insufficient to show a setting where "violence and terror" reigned); *Marbury*, 936 F.3d at 1234 (fifteen gang-related stabbings insufficient to show "an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm.").

Defendants Plugge and Williams were employed by MHM Correctional Services, Inc., a private company that contracted with the GDC to provide services to inmates. Although they are state actors such that Plaintiff's Eighth Amendment claims against them are cognizable under § 1983 and analyzed under the same framework, they are not entitled to invoke qualified immunity.[162] But Plaintiff fails to establish any genuine issue of materal fact exists that Plugge and Williams were subjectively aware that Plaintiff faced a substantial risk of harm before either the April 20th or August 7th rapes, and she therefore fails to establish a constitutional violation.

Plaintiff contends she wrote a letter to Plugge on April 16, 2018, and complained directly to Plugge and Williams on April 19, 2018, before she was assaulted on April 20th.  In her letter to Plugge, Plaintiff states she expressed fear that "gang members preyed on weaker inmates"; she faced "substantial risk" of sexual assault because of her transgender status; she had written to Blakely, Jackson, and Woods to move her but no action had been taken; she remained in G-2 "with perpetrators who continue[d] to sexually harass and coerce [her] with threats into having sex; and she pleaded to be transferred and moved to a "PREA safe dorm" while at VSP. Plaintiff argues that her transgender status, her institutional records detaling her history as a victim of sexual

---

[162] *See, e.g., Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (holding private prison guards "do not enjoy qualified immunity from suit in a § 1983 case"). *See also Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) ("[A] privately employed prison physician[ ] is ineligible to advance the defense of qualified immunity.").

assault at two other institutions, and her direct complaints establish a genuine issue of fact as to whether the MHM Defendants were subjectively aware of a substantial risk of harm.

Defendant Plugge has conclusively established that she could not have received Plaintiff's letter dated April 16, 2018, or had a conversation with Plaintiff on April 19, 2018. The record contains a copy of Plugge's passport which shows she was out of the country in the Dominican Republic from April 15 to April 21, 2018, the day after Plaintiff's first rape. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[163] Thus, Plaintiff's failure-to-protect claim against Plugge rests on Plugge's knowledge of Plaintiff's transgender status and her history as a victim of sexual assault at two different institutions, neither of which were at VSP. As explained above, such evidence wholly fails to establish Plugge was subjectively aware of a substantial risk of harm.

Even if the Court considers all of Plaintiff's evidence, it at most shows that Plugge and Williams had knowledge of a generalized risk of harm, not a particularized risk. Although Plaintiff claimed she continued to be harassed and threatened, she did not particularize who was threatening and harassing her, only stating it was by unidentified

---

[163] *Scott v. Harris*, 500 U.S. 372, 380 (2007).

"perpetrators." She did not state how often she received the threats or request to be placed in protective custody. Both Plugge and Williams testified that Dorm G-2 was the best place to house Plaintiff, and there were no "PREA-safe" dorm designations at VSP.

As to Plaintiff's August 7th assault, the record contains no evidence showing that Plugge or Williams would have been subjectively aware of a substantial risk of harm. Following the PREA investigation of the April 20th assault, SART determined Plaintiff's claim was unfounded. Plaintiff did not make any additional complaints to Plugge or Williams. Thus, Plugge and Williams are entitled to summary judgment.

## CONCLUSION

For the reasons explained above, the Court finds the GDC Defendants are protected from liability by qualified immunity, and therefore entitled to summary judgment. The MHM Defendants are also entitled to summary judgment because Plaintiff has failed to establish a genuine issue of material fact that they violated her Eighth Amendment rights. Thus, Defendants' Motions [Docs. 54 and 55] are **GRANTED**.

**SO ORDERED,** this 31st day of March, 2022.

s/Hugh Lawson
HUGH LAWSON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

SSH

36